UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

BARBARA WHITTAKER,
Personal Representative and
Administrator of the Estate
of George Michael Jenkins,

        Plaintiff,

v.                         Case No. 3:14-cv-1503-J-39MCR

KENNETH S. TUCKER, et al.,

        Defendants.

_____

**ORDER**

**I. Status**

Plaintiff Barbara Whittaker, in her capacity as personal representative of her deceased brother's estate, is proceeding with the assistance of court-appointed counsel on a Second Amended Complaint (Doc. 39; Complaint) under 42 U.S.C. § 1983. In the Complaint, Plaintiff alleges Defendants violated the decedent George Michael Jenkins' constitutional right to be free from cruel and unusual punishment when he was an inmate of the Florida Department of Corrections (FDOC).[1] See Complaint at 9, 13. Before

_____

[1] After Jenkins filed his Second Amended Complaint, he passed away. On November 20, 2017, the Court granted the personal representative Barbara Whittaker's unopposed motion to substitute her as the proper party. See Order (Doc. 63). As such, the Court will refer to Ms. Whittaker as "Plaintiff" and will refer to the former inmate as "Jenkins."

the Court is Defendants Corbin, Humphrey, Rogers, and Tucker's Motion for Summary Judgment (Doc. 106; Motion).[2] Plaintiff's counsel responded to the Motion (Doc. 109; Motion Response). As such, the Motion is ripe for this Court's review.

Before addressing the merits of the Motion, the Court first addresses Defendants' Objection to Plaintiff's Reliance on Inadmissible Evidence (Doc. 115; Objection). Defendants object to the Court's consideration of Jenkins' affidavit (Doc. 1-1; Jenkins Aff.) and Jenkins' prison grievances (Docs. 109-6, 109-7, 109-8), each of which Plaintiff relies upon to defeat summary judgment. Objection at 2-3. Citing Rule 56(c), Defendants argue that because Jenkins is deceased, the facts contained in his affidavit and grievances are not capable of being "presented in a form that would be admissible in evidence." See Fed. R. Civ. P. 56(c)(2). Defendants contend Jenkins' affidavit and grievances constitute inadmissible hearsay and no hearsay exception applies. Objection at 3-4.

In response, Plaintiff maintains the facts contained in the documents are capable of being reduced to admissible evidence for

---

[2] On February 22, 2019, defense counsel filed a notice of suggestion of death as to the only other remaining Defendant, Chris Landrum (Doc. 111). As such, defense counsel is no longer able to represent Defendant Landrum's interests in this action. See Motion at 1 n.1. There is no indication defense counsel served the notice of suggestion of death in compliance with Federal Rule of Civil Procedure 25(a)(3).

trial (Doc. 116; Objection Response). Plaintiff asserts the facts contained in Jenkins' affidavit are capable of being reduced to admissible evidence under the "excited utterance" exception. Objection Response at 3. As to the grievance documents, Plaintiff asserts the "records" exception to the hearsay rule applies. Id.

A party opposing summary judgment may rely upon affidavits or sworn pleadings. Fed. R. Civ. P. 56(c)(4). However, such documents must "set out facts that would be admissible in evidence, and [the opponent must] show that the affiant or declarant is competent to testify on the matters stated." Id. Because Jenkins is unavailable to testify on the matters stated in his affidavit and grievances, his out-of-court statements, to the extent offered to "prove the truth of the matter asserted," constitute inadmissible hearsay. See Fed. R. Evid. 801 (defining "hearsay").

In opposing summary judgment, Plaintiff offers the facts in Jenkins' affidavit to demonstrate he was sexually assaulted by Defendants Corbin, Humphrey, and Rogers when they engaged Jenkins in a spontaneous use of force on November 11, 2011, at Suwannee Correctional Institution (SCI). See Motion Response at 13. In his affidavit, which Jenkins filed in support of his original, sworn complaint (Doc. 1; Original Complaint), Jenkins avers the following:

> I was removed from my prison infirmary cell,
> stripped of all clothing and upon being placed
> back in my infirmary cell [I] was manhandled

and placed face down[.] [I] saw [Defendant]
Humphrey with what appeared to be a broken
broomstick. I was choked and had an object
placed over my head, [I] was sexually
assaulted and the object that was shoved up my
rectum caused an immediate – pre mature [sic]
movement of the bowels.

Jenkins Aff. at 2; see also Original Complaint at 4.

To overcome summary judgment, Plaintiff offers no evidence of
the alleged sexual assault other than the allegations contained in
Jenkins' affidavit and his sworn complaint. See Motion Response.
There were no witnesses to the use of force incident other than
corrections officers, including the named Defendants, and neither
party offers video evidence.[3] As such, the affidavit is offered
for the truth of the matter asserted and therefore constitutes
inadmissible hearsay unless a hearsay exception applies under the
Federal Rules of Evidence.

Plaintiff contends the excited utterance exception applies.
See Objection Response at 3 (citing Fed. R. Evid. 803(2)).
Plaintiff testified at her deposition that after Jenkins was
released from prison, she and Jenkins lived together for a couple
of weeks (Doc. 109-10; Plaintiff Dep.). Plaintiff testified

---

[3] In the use of force report, a reviewing senior officer notes,
"[t]his spontaneous use of force was captured on wing camera."
Motion Ex. B at 4. In response to the Court's Order (Doc. 117)
requesting the fixed-wing camera footage, Defendants notified the
Court the fixed-wing footage "no longer exists." See Notice (Doc.
118).

Jenkins was upset one day, and he referenced someone having tried to kill him in prison:

> [O]ne morning I heard [Jenkins] very upset, he was just ranting and raving. . . . And he was saying – he was reading – he had read something. And he just said, "These mother fu***ers. These mother fu***ers they all – they tried to kill me. These mother fu***ers in prison tried to kill me." And so I said to him, "Sometimes you have to – in order to move on with your life, you have to forgive and forget." And he just really kind of exploded. "What you mean forgive and forget?" He said, "These mother fu***ers almost beat me to death and they run all kind of shit up my ass and you want me to forgive and forget?" And with that I just stopped and said, "Okay. I have to go to work." And I never asked any questions.
>
> So from that point on if I ever saw him get upset or anything, saw him upset, I would just make myself scarce. I would – I wouldn't be around because I didn't want to hear it. I didn't ask for any details. I didn't want to hear the details.

Plaintiff Dep. at 15-16.[4]

Under the Rules of Evidence, an excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). In determining whether a declarant speaks while under the stress of the event, the length of time between the event and the utterance is relevant. See United States v.

---

[4] Page numbers referenced in this Order are those assigned by the Court's electronic docketing system.

_Belfast_, 611 F.3d 783, 817 (11th Cir. 2010) (recognizing the excited utterance need not be made contemporaneously to the startling event but, in the totality of the circumstances, the declarant must have been speaking while under the stress the event caused). See also United States v. Carlisle, 173 F. App'x 796, 801 (11th Cir. 2006) ("An out-of-court statement made at least fifteen minutes after the event it describes is not admissible [as a hearsay exception] unless the declarant was still in a state of excitement resulting from the event.") (quoting United States v. Cain, 587 F.2d 678, 681 (5th Cir. 1979) (internal quotation marks omitted; alteration in original)).

Here, the alleged sexual assault occurred on November 11, 2011. Complaint at 3. Taking as true the sexual assault occurred as Jenkins describes it in his affidavit, the encounter constitutes a "startling event." However, Jenkins' statement to Plaintiff was made at least three years after the startling event occurred; according to the FDOC website, Jenkins was released from prison on February 17, 2015.[5] Three years later, Jenkins cannot be said to have been under the stress of the excitement of the incident. Under these facts, Jenkins' statement to Plaintiff, made after his release from FDOC custody and at least three years after the

---

[5] See FDOC website, offender network search, available at http://www.dc.state.fl.us/OffenderSearch/InmateInfoMenu.aspx (last visited July 9, 2019).

"startling event" does not constitute an "excited utterance."
Accordingly, the Court finds the excited utterance exception is
inapplicable.[6]

Plaintiff offers no other basis upon which the facts contained
in Jenkins' affidavit or his sworn complaint may be reduced to
admissible form. As such, the Court sustains Defendants' Objection
to the extent Jenkins' affidavit and sworn complaint constitute
inadmissible hearsay, the facts of which Plaintiff fails to
demonstrate can "be presented in a form that would be admissible
in evidence." See Fed. R. Civ. P. 56(c)(2). In ruling on
Defendants' Motion for Summary Judgment, therefore, the Court will

---

[6] To the extent Plaintiff suggests she can testify at trial about
the alleged sexual assault, her deposition testimony belies such
a conclusion. Plaintiff testified she did not ask Jenkins any
questions about his outburst because she did not want to know the
details. See Pl. Dep. at 15-16. Jenkins' statement, as explained
by Plaintiff at her deposition, is exceedingly vague and devoid
of any information upon which a reasonable trier of fact could
conclude Defendants Corbin, Humphrey, and Rogers sexually
assaulted Jenkins on November 11, 2011. "[A] mere scintilla of
evidence in support of the non-moving party's position is
insufficient to defeat a motion for summary judgment." Kesinger
ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247
(11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 252 (1986)). Even more, there is no indication Jenkins
was even referring to the November 11th incident when he made the
statement to Plaintiff. The incident complained of in this case
is not the only instance of excessive force Jenkins claims to
have suffered while in prison. Jenkins filed a separate action in
this Court alleging he was beaten by officers on October 27, 2010,
while housed at a different correctional institution. See Second
Amended Complaint (Doc. 28), Case No. 3:14-cv-1318-J-20MCR.
According to Jenkins, the 2010 beating resulted in
hospitalization and left him disabled, resulting in his need for
a wheelchair and a helmet to protect against seizures. Id.

7

not consider the allegations in Jenkins' affidavit or his sworn complaint. See McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996) (holding inadmissible hearsay may not be used to defeat summary judgment if the hearsay evidence "will not be available in admissible form at trial").

With respect to the grievance documents (Docs. 109-6, 109-7, 109-8), the Court finds Plaintiff relies upon those not to prove the truth of the matter asserted but to demonstrate Jenkins submitted grievances to the Warden of his correctional facility. Accordingly, the Court overrules Defendants' Objection to the extent they object to the Court's consideration of the grievance documents Plaintiff submits in opposition to the Motion for Summary Judgment.[7]

## II. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents,

---

[7] Plaintiff offers the grievance documents in support of her supervisory claim against Defendant Tucker. She asserts Warden Landrum received three formal grievances from Jenkins, which were not "escalated because there was likely minimum oversight from Defendant Tucker." Motion Response at 12. Given the Court's ruling on Plaintiff's claims against the subordinate Defendants, Corbin, Humphrey, and Rogers, as explained in this Order, the grievance documents are not material to the Court's analysis.

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger, 381 F.3d at 1247.

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).

Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### III. Facts & Claims for Relief

Jenkins' claims arise out of a documented spontaneous use of force incident that occurred at SCI on November 11, 2011, involving Defendants Corbin, Humphrey, and Rogers. On the date of the incident, Jenkins was housed in the prison infirmary/medical isolation area. Complaint at 3; Motion Ex. B at 4. He was on close management, self-harm observation status and was documented as a "mental health grade level 2." Motion Ex. C at 3-4.[8]

The use of force incident under review occurred at approximately 9:15 a.m. <u>Id.</u> at 4, 7. Earlier that morning, at about 7:10 a.m., according to a nurse's entry in Jenkins' "Chronological Record of Health Care" (medical chart) (Doc. 110-2; Motion Response Ex. B), Jenkins was angry and banging on his cell windows. After

---

[8] Jenkins had multiple health issues. He used a wheelchair and wore a helmet (because of seizures). <u>See</u> Motion Ex. A; Motion Ex. E at 14, 25. In a statement in response to disciplinary charges, Jenkins described himself as having schizophrenia, bipolar disorder, and severe personality disorder. Motion Ex. E at 18. Jenkins also suffered "acute brain damage causing severe seizures," hallucinations, and memory loss. <u>Id.</u>

observing Jenkins at his cell, Nurse Hancock wrote the following entry in the medical chart: "[Inmate] has hand wrapped up and has been banging on window off and on for about 50 min[utes]. [He h]as been acting out [for two] evenings and was started on a [management] meal this [morning].[9] Affect angry." Motion Response Ex. B at 2.

Nurse Bisque, who was on duty at the time of the use of force incident, made an entry in the medical chart at 2:10 p.m. on November 11, 2011 (after the incident). Id. at 3. She noted having been informed that, in the morning, Jenkins was agitated and banging on his cell window. Nurse Bisque wrote the security officer counseled Jenkins "cell front," and Jenkins threatened the officer and yelled obscenities. Id. After the officer in charge arrived,[10] Jenkins was brought to the nurses' station while Defendant Corbin was searching his cell pursuant to a 72-hour property restriction order imposed because of Jenkins' recent disruptive and threatening behavior and his property was in disarray. Id.; Motion Ex. B at 4. When Jenkins was at the nurses' station, he continued

---

[9] According to an incident report, Jenkins was "placed on management meal by the Third Shift on 11-10-11 [the day prior to the incident] for throwing a tray at an officer." Motion Ex. B at 13.

[10] The security officer and the officer in charge are not identified by name. Upon review of the record, it appears the "security officer" references Defendant Corbin, and the "officer in charge" references either Lieutenant Keith or Captain Stout.

his threatening behavior. Shift supervisor Captain Stout was present, along with Lieutenant Keith. Both Stout and Keith heard Jenkins state, "If you put me on strip I am going to kill the first staff member that I get my hands on." Ex. E at 3, 16.[11]

The use of force incident occurred after the cell search was complete and Defendant Corbin was attempting to return Jenkins, who was in a wheelchair, to his cell. Motion Ex. B at 4. Defendants Rogers and Humphrey were present, as well as Lieutenant Keith, who ordered Jenkins to submit to having his shirt removed for a strip search. Jenkins refused. In his use of force report, Defendant Corbin explains the following:

> I completed my search and removal of property from [Jenkins' cell], and was attempting to place inmate Jenkins back into his cell when he told[] Sergeant James Rogers, Officer Michael Humphrey and myself that we were going to have to "run it to get his clothes and he wasn't going on strip." At that time, Lieutenant Jason Keith, who was present gave several verbal orders for inmate Jenkins to submit to having his shirt removed . . . . Inmate Jenkins stated "No it ain't happening" and inmate Jenkins spun his wheel chair [sic] around [and] stood up and lunged at me in an aggressive and agitated manner stating "I'm gonna f*** you up!" At this time, I side stepped and placed both hands on the back of the inmate grasping his shirt and directed the inmate to the floor in the prone position. Sergeant Rogers and Officer Humphrey were present and assisted in controlling Inmate Jenkins' extremities. I then repositioned inmate Jenkins['] upper torso inside the cell

---

[11] Jenkins' threat resulted in a disciplinary charge against him. Motion Ex. E at 3.

door, by lifting his upper torso from the
floor and turning him inside the cell, his
lower extremities were already inside the cell
at that point. After inmate Jenkins was inside
the cell, I released my hold, at this time all
force ceased. I secured the cell door and I
removed his restraints utilizing a restraint
chain through the cuff port, without further
incident.

Id. Defendants Rogers and Humphrey each signed the use of force
report, confirming their roles in subduing Jenkins. Id. at 5,8.
Defendant Rogers wrote, "I placed both my hands on inmate
Jenkins['] shoulder area limiting his movement and preventing any
further aggressive movements. Once inmate Jenkins ceased his
actions, I released my hold and all force ceased by me." Id. at 5,
8. Defendant Humphrey wrote, "I placed both hands on inmate
Jenkins['] legs, preventing him from kicking any staff and
preventing any further aggressive movements. Once inmate Jenkins
ceased his actions, I released my hold and all force ceased by
me." Id. at 5, 8.

Nurse Bisque did not witness the use of force. However, she
was called to the cell for a post use of force examination, which
Jenkins refused. Id. at 9. In her post use of force exam report,
Nurse Bisque noted Jenkins was shouting at and threatening staff,
preventing her from physically examining him. She observed a "small
amount of blood and spit on the floor" of Jenkins' cell, though
Jenkins did not appear to be in distress. Id. Upon her visual

observation of Jenkins through the window, Nurse Bisque concluded there was no need for medical treatment. Id.

Nurse Bisque also recorded her impression of Jenkins' condition after the use of force incident in the medical chart:

> [Inmate Jenkins] was lying on mattress [and] floor of cell [and] was hold [sic] his safety helmet to his face [with] his [left] hand. Writer observed movement mandibles [sic] in a biting motion [and] hand was pressing helmet into his face with force. [Inmate] was in no acute distress . . . . No apparent injuries to torso [and] limbs identified. During post use of force exam [inmate] threatened to kill staff . . . . [Post use of force exam] refused. [Inmate] unable to sign [form] due to property restrictions.

Motion Response Ex. B at 3. Nurse Bisque made another entry in the medical chart shortly after her cell-front visual exam, stating Jenkins was "quiet in [his] cell." Id. at 4. He appeared to be sleeping. The next day, on November 12th, Jenkins was reported to be alert and talking to staff appropriately with no complaints. Id. On November 13th, Jenkins was "resting quietly." Id. On November 14th, Jenkins exhibited some signs of "acute distress" and difficulty talking, which appeared related to his heart condition. Id. The nurse noted a chest x-ray and EKG would be ordered after Jenkins was "deemed less of a threat to staff." Id. There was no explanation as to the nature of the threat Jenkins posed at that time. Nurses' entries for November 16th, 17th, and

19th provide no indication of physical injury or distress related to the November 11th incident. Id. at 5.

In the Complaint, Plaintiff claims Jenkins was subjected to the excessive use of force in violation of the Eighth Amendment when he was sexually assaulted. Complaint at 9. Plaintiff names Defendant Tucker in his role as the Secretary of the FDOC at the time. Id. at 2-3. Plaintiff alleges Defendant Tucker is liable for his "failure to train and/or supervise Defendants Corbin, Humphrey, and Rogers . . . as well as [his] implementation of customs and/or policies of abuse towards incarcerated inpatients at the [SCI]." Id. Plaintiff seeks general, compensatory, and punitive damages, costs and fees, and any other relief deemed appropriate. Id. at 14.[12]

## IV. Legal Analysis & Conclusions of Law

### A. Claims Against Defendants Corbin, Humphrey, and Rogers: Qualified Immunity

Defendants Corbin, Humphrey, and Rogers (collectively, "Officers") assert they are entitled to qualified immunity. Motion at 12. In response, Plaintiff asserts the Officers "had no lawful reason for a cell search or a strip search," and they sexually

---

[12] The Court previously dismissed Plaintiff's claim for monetary damages against Defendant Tucker in his official capacity. See Order (Doc. 52). As such, only the individual capacity claim remains. Plaintiff names Defendants Corbin, Humphrey, and Rogers in their individual and official capacities. See Complaint at 1.

assaulted Jenkins in retaliation for his filing grievances.[13]
Motion Response at 13. An officer sued in his individual capacity
"is entitled to qualified immunity for his discretionary actions
unless he violated 'clearly established statutory or
constitutional rights of which a reasonable person would have
known.'" Black v. Wigington, 811 F.3d 1259, 1266 (11th Cir. 2016)
(quoting Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009)).
Qualified immunity allows officers to exercise their official
duties without fear of facing personal liability. Alcocer v. Mills,
906 F.3d 944, 951 (11th Cir. 2018). The doctrine protects all but
the plainly incompetent or those who knowingly violate an inmate's
constitutional rights. Id. Upon asserting a qualified immunity
defense, a defendant bears the initial burden to demonstrate he
was acting in his discretionary authority at the relevant times.
Dukes v. Deaton, 852 F.3d 1035, 1041-42 (11th Cir.), cert. denied,
138 S. Ct. 72 (2017).

It is well understood that prison guards are charged with
maintaining order and protecting inmates and staff. Indeed, Eighth
Amendment jurisprudence permits prison guards leeway to use force
when necessary "to maintain or restore discipline." Whitley v.
Albers, 475 U.S. 312, 320-21 (1986). In their role of maintaining
order and ensuring safety, prison guards must react to and resolve

---

[13] Plaintiff does not assert a First Amendment claim against the
Officers. See Complaint.

prison disturbances or threats of harm. See, e.g., Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir. 1991) (citing Brown v. Smith, 813 F.2d 1187, 1188 (11th Cir. 1987)).

Here, the uncontradicted evidence demonstrates Defendants Corbin, Humphrey, and Rogers were acting within the scope of their discretionary duties when they used force against Jenkins in an effort to protect themselves, Jenkins, and others. In the use of force report, Defendant Corbin states he encountered Jenkins in the scope of his assigned role as Internal Security Supervisor. See Motion Ex. B at 4. Defendants Rogers and Humphrey were on duty in their respective roles as Sergeant (Rogers) and Officer (Humphrey). Id. at 8. In those roles, Defendants Rogers and Humphrey assisted in restraining Jenkins. Id. at 4, 5, 8. In the scope of their duties, the Officers completed an incident report, which included their respective titles and described their individual efforts to subdue Jenkins. Id.

While unclear, Plaintiff appears to suggest the Officers acted outside the scope of their discretionary authority, stating they "had no lawful reason for a cell search or a strip search and [were] so grossly untrained and under supervised that they did not receive authorization to proceed from a superior officer." Motion Response at 13. Plaintiff also claims the Officers' actions violated relevant state and prison rules because the use of force was not videotaped; Defendants did not observe the three-minute

cooling off period before entering Jenkins' cell; Defendants did not obtain permission from a superior officer to enter Jenkins' cell to conduct a strip search; and a doctor was not present during the use of force. Id.

Plaintiff points to no evidence to support these bald conclusions, nor does Plaintiff specify which Officer allegedly acted outside his discretionary authority. See id. On the contrary, the evidence demonstrates no rule violations: both the Correctional Officer Chief, J.C. Stephens, and the Warden, C. Landrum, signed the incident report, concluding the use of force was conducted in compliance with the Florida Administrative Code provision 33-602.210 and with Departmental Rule and Procedure. Motion Ex. B at 12. Accordingly, the Court is satisfied Defendants Corbin, Humphrey, and Rogers have met their initial burden to demonstrate they were acting in the scope of their discretionary duties when they used force against Jenkins.

Once a court is satisfied the defendant was acting within his discretionary authority, the burden shifts to the plaintiff to demonstrate the defendant is not entitled to qualified immunity. Coley v. Smith, 441 F. App'x 627, 628 (11th Cir. 2011) (citing Bryant v. Jones, 575 F.3d 1281, 1294 (11th Cir. 2009)). To overcome the qualified immunity defense, a plaintiff bears the burden to demonstrate two elements: the defendant's conduct caused plaintiff to suffer a constitutional violation, and the constitutional

violation was "clearly established" at the time of the alleged violation. Id. See also Davila v. Gladden, 777 F.3d 1198, 1210-11 (11th Cir. 2015). Courts may exercise discretion to "conduct the qualified immunity analysis" in either order. Id. at 1211. Exercising its discretion, the Court finds the qualified immunity analysis begins and ends with the first element because Plaintiff fails to demonstrate the Officers' actions resulted in a constitutional violation under the Eighth Amendment.

"Because § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Alcocer, 906 F.3d at 951 (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam)). As such, the Court will analyze Plaintiff's excessive force claim against Defendants Corbin, Humphrey, and Rogers in consideration of their respective actions during the incident.

The Eighth Amendment's proscription against cruel and unusual punishment "prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification." Ort v. White, 813 F.2d 318, 321 (11th Cir. 1987). In ensuring inmates are not subject to "punishment grossly disproportionate to the severity of the offense," courts must be

mindful that they should normally not interfere in matters of prison administration or inmate discipline. Id. at 322.

In analyzing use of force incidents through a prism of deference, courts must balance concerns of an inmate's right to be free from cruel and unusual punishment with a prison official's obligation to ensure a safe and secure institution. Id. 321-22. "The Court's decisions in this area counsel that prison officials should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Id. at 322 (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)).

Because of the deference afforded prison officials, an inmate against whom force is used to restore order or quell a disturbance demonstrates an Eighth Amendment violation only when the official's action "inflicted unnecessary and wanton pain and suffering." Id. (internal citations omitted). Indeed, "[t]he Supreme Court has held that . . . any security measure undertaken to resolve [a] disturbance gives rise to an Eighth Amendment claim only if the measure taken 'inflicted unnecessary and wanton pain and suffering' caused by force used 'maliciously and sadistically for the very purpose of causing harm.'" Williams, 943 F.2d at 1575 (emphasis is original) (quoting Whitley, 475 U.S. at (1986)).

The Eleventh Circuit has articulated five factors courts may consider in determining whether an officer's use of force was in good faith or carried out maliciously and sadistically for the purpose of causing harm:

> (1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley, 475 U.S. at 321; Hudson v. McMillian, 503 U.S. 1, 7 (1992)). See also Ort, 813 F.2d at 323; Williams, 943 F.2d at 1575.

Here, the Officers do not dispute they used force against Jenkins, and the record shows there was a need to do so. Not only did Jenkins make a threatening action toward Defendant Corbin but he also orally threatened Corbin. Defendant Corbin states in both the use of force and incident reports that "Jenkins spun his wheel chair [sic] around and stood up and lunged at [him] in an aggressive and agitated manner stating "I'm gonna f*** you up!". Motion Ex. B at 4, 12. Lieutenant Keith, who was present, witnessed Jenkins' apparent attempt to physically harm Defendant Corbin. Id. at 12. In his written report, Lieutenant Keith states Jenkins "made threats against staff[,] then left his wheel chair [sic] and lunged towards staff." Id. And, a nurse's note in the medical chart,

written three days later, states, "informed by security that patient stood up [and] physically charged [at] an officer on 11/11/11." Motion Response Ex. B at 5.

The fact that Jenkins was being transported in a wheelchair at the time of the incident does not mean he posed no harm to others or to himself. As Plaintiff alleges in the Complaint, at the time of the incident, there was a dispute regarding whether Jenkins would be permitted to have his wheelchair inside his cell, whether it should remain in the vestibule area, or whether a wheelchair should be assigned to him as needed. Complaint at 4. Given the dispute about Jenkins' wheelchair requirements and the record evidence, it appears Jenkins was capable of standing and walking without assistance. For instance, a nurse's entry on November 17th indicates Jenkins was "mobile." Motion Response Ex. B at 5. The post use of force exam hand-held video footage also shows Jenkins was capable of independent movement; he is seen in the video moving from a sitting position to a kneeling position with no difficulty or signs of distress. Motion Ex. C. Moreover, a disciplinary hearing resulted in a finding of guilt against Jenkins for attempted battery, based on his action of lunging out of his wheelchair toward Defendant Corbin. Motion Ex. E at 20.

Jenkins' threatening action toward Defendant Corbin also must be considered in the context of his demeanor and conduct preceding the incident. Jenkins was described as "angry" earlier that

morning, Motion Response Ex. B at 2, and when Defendant Corbin was executing the property restriction, Jenkins threatened to kill the first staff member he could get his hands on, Motion Ex. E at 6. Jenkins also had been acting out for two days before the incident. Motion Response Ex. B at 2. Knowing Jenkins was agitated, angry, and had threatened to physically harm staff, Defendants Corbin, Humphrey, and Rogers reasonably reacted to Jenkins' apparent attempt to carry out his threat. Indeed, in the disciplinary report, Defendant Corbin wrote, "[i]t became necessary to use physical force to prevent Inmate Jenkins from assaulting myself or any other staff." Motion Ex. E at 19. Under the circumstances faced by the Officers, the Court will not second-guess Defendants Corbin's, Humphrey's, and Rogers's individual and split-second reactions to Jenkins' threatening behavior.

The amount of force Defendants Corbin, Humphrey, and Rogers used in response to Jenkins' behavior was minimal. Defendant Corbin explains he "placed both hands on the back of the inmate grasping his shirt and directed the inmate to the floor in the prone position." Motion Ex. B at 4. Defendants Humphrey and Rogers assisted by holding Jenkins' extremities to "prevent[] any further aggressive movement." Id. at 8. The Officers all confirm that once Jenkins was restrained and placed back inside his cell, "all force ceased." Id. at 4, 5, 8. There is no evidence the Officers used any more force against Jenkins than what they describe in their

reports. Other than Plaintiff's unsupported statement that Defendants sexually assaulted Jenkins, see Motion Response at 13, there is no evidence suggesting or permitting a reasonable inference that the Officers used unnecessary force for the purpose of causing Jenkins harm.[14]

Finally, Jenkins did not sustain any significant injuries attributable to the Officers' use of force. Immediately after the incident, Nurse Bisque visited Jenkins at his cell, along with Lieutenant Keith, and she noted there was "no need for treatment." Motion Ex. B at 9. She recorded only a "small amount of blood and spit on the floor," but no apparent distress or physical injury was observed. Id. at 9, 10. A review of the hand-held video, Motion Ex. C, shows Nurse Bisque and Lieutenant Keith had a good view of Jenkins: the front of his cell was all windows providing an unobstructed view inside, and Jenkins was sitting upright on the floor directly in front of the windows. The video, as reviewed by this Court, shows Jenkins sitting upright in no apparent distress and with no observable physical injuries. Id.

Plaintiff points to no evidence demonstrating Jenkins sustained serious injuries. See Motion Response at 14. Rather, Plaintiff merely asserts Jenkins was "vulnerable to physical

---

[14] As discussed previously, the Court does not credit the allegations in Jenkins' affidavit or sworn complaint in which he asserts Defendants sexually assaulted him.

injuries" because of his extensive medical history. Id. at 13. Plaintiff further states the post use of force examination report notes "minor injuries." Id. at 14. However, Plaintiff offers no evidence to demonstrate the nature and extent of any injuries Jenkins may have sustained during the use of force. In fact, according to the nurses' entries on the medical chart, which Plaintiff offers as an exhibit, there is no indication that Jenkins later complained of pain or injury attributable to the incident. See Motion Response Ex. B at 4-5.

Applying the relevant factors, the evidence, viewed in the light most favorable to Plaintiff, demonstrates the Officers used force in good faith and not for the purpose of causing harm: the extent of any injury was minimal; there was a demonstrated penological justification for the use of force; the amount of force used was minimal in relation to the need for the use of force; all force ceased once Jenkins was returned to his cell; and Jenkins posed a threat to the Officers and himself when he lunged out of his wheelchair toward Defendant Corbin. See Campbell, 169 F.3d at 1375.

Plaintiff offers no evidence to suggest or permit a reasonable inference that the Officers acted maliciously and sadistically for the purpose of causing harm or used more force than necessary to subdue Jenkins after he lunged at Defendant Corbin. See Whitley, 475 U.S. at 322 ("Unless it appears that the evidence, viewed in

the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury."). Plaintiff, therefore, fails to demonstrate the Officers, in their individual capacities, violated Jenkins' constitutional rights. As such, there is no basis for Plaintiff's claims against the Officers in their official capacities. See Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1309 (11th Cir. 2009).

Because the Court finds Plaintiff has failed to carry her burden to demonstrate a constitutional violation, the Court need not proceed to the next step of the qualified immunity analysis—determining if a constitutional right was clearly established. Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1194 (11th Cir. 2003). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Case, 555 F.3d at 1327 (quoting Saucier v. Katz, 533 U.S. 194 (2001)). Accordingly, Defendants Corbin, Humphrey, and Rogers are entitled to qualified immunity and the claims against them are due to be dismissed.

### B. Claims Against Defendant Tucker

Defendants assert Plaintiff fails to state a claim for supervisory liability against Defendant Tucker. Motion at 2, 6. In the Complaint, Plaintiff alleges Defendant Tucker is liable under a theory of "supervisory liability/respondeat superior" because he

26

failed to train and/or supervise Defendants Corbin, Humphrey, and Rogers, and based on a custom or policy of abuse toward inpatients at SCI. Complaint at 9.

Because the Court finds no underlying constitutional violation, Plaintiff's supervisory liability claim against Defendant Tucker necessarily fails. See Mann, 588 F.3d at 1308 (holding the plaintiff's supervisory liability claim failed "because the underlying § 1983 claims fail[ed]") (citing Hicks v. Moore, 422 F.3d 1246, 1253 (11th Cir. 2009)). As such, the supervisory claim against Defendant Tucker is due to be dismissed.

## V. Claims Against Defendant Landrum: Sua Sponte Frivolity Review

In his Complaint, Plaintiff also sues Chris Landrum. See Complaint at 9. After this Court's ruling on Defendant Landrum's motion to dismiss, only the individual liability claim against him remains. See Order (Doc. 52). Defendant Landrum's interests are not represented in the Motion before this Court. Under Federal Rule of Civil Procedure 25(a)(1), Defendants filed a Notice of Suggestion of Death of Defendant Landrum on February 22, 2019 (Doc. 111), attaching the certificate of death (Doc. 111-1). See also Motion at 1. Given Defendant Landrum's death, defense counsel no longer represents his interests in this case. See Motion at 1 n.1.

In light of the Court's ruling that Defendant Landrum's subordinates, Defendants Corbin, Humphrey, and Rogers, are entitled to qualified immunity, the Court exercises its authority

under the Prison Litigation Reform Act (PLRA) to assess the viability of Plaintiff's claim against Defendant Landrum. See 28 U.S.C. § 1915(e)(2)(B).[15] The PLRA requires the Court to dismiss a claim at any time if the Court determines it is frivolous, malicious, fails to state a claim upon which relief can be granted or seeks monetary relief against a defendant who is immune from such relief. Id.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) the defendant deprived him of a constitutional right and (2) such deprivation occurred under color of state law. Salvato v. Miley, 790 F.3d 1286, 1295 (11th Cir. 2015); Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011). A claim under § 1983 also requires a plaintiff provide "proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation." Zatler, 802 F.2d at 401.

Plaintiff brings a claim against Defendant Landrum under § 1983 for "supervisory liability," alleging Defendant Landrum, at relevant times, was the warden at SCI and in that role, "was responsible for the maintenance and care at that institution, and the administration of its policies and procedures." Complaint at 3, 9. Plaintiff asserts Defendant Landrum "fail[ed] to train and/or supervise Defendants Rogers, Corbin, and Humphrey . . . [and]

---

[15] Plaintiff is proceeding in forma pauperis. See Order (Doc. 7).

implement[ed] [] customs and/or policies of abuse towards incarcerated inpatients at the [SCI]." Id. According to Plaintiff, the subordinate officers, Corbin, Humphrey, and Rogers violated Jennkins' constitutional rights during the execution of the cell search and "the subsequent sexual assault," and the violation "demonstrate[s] that they were not properly supervised and/or trained by their Superior Officers," including Defendant Landrum. Id. at 11.

Plaintiff alleges the lack of supervision and training provides the causal connection between the alleged constitutional violation and Defendant Landrum's role as warden. Id. 11-12. Plaintiff generally asserts a causal connection in the Complaint, but states "[f]urther documentation regarding the causal link that exists between the Superior Officers' failure to train and/or supervise their Subordinate Officers and the violation of Mr. Jenkin' Rights can be produced during the discovery process." Id. at 13. Finally, Plaintiff alleges Defendant Landrum "should have been aware of the several formal grievances filed by Mr. Jenkins," and Landrum's "refusal to investigate the situation" amounts to deliberate indifference to Jenkins' constitutional rights. Id. Plaintiff does not allege Defendant Landrum personally participated in the use of force or the alleged sexual assault. See Complaint.

An individual cannot be held liable under § 1983 on the basis of that person's supervisory position alone. See Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citation omitted) ("It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."). A supervisor may be held liable where there is a causal connection between the alleged constitutional violation and actions or inactions of the supervisor.

In the absence of a supervisor's personal participation in the alleged conduct, a plaintiff may demonstrate the necessary causal connection by showing the supervisor knew about and failed to correct a widespread history of abuse; the supervisor's custom or policy resulted in a constitutional violation; or the supervisor either directed a subordinate to act unlawfully or knew the subordinate would act unlawfully and failed to prevent the action. Harrison v. Culliver, 746 F.3d 1288, 1289 (11th Cir. 2014).

Allegations that a supervisor failed to adequately train or supervise subordinates implicates a slightly different theory of supervisory liability under § 1983. See, e.g., Keith v. DeKalb Cty., Ga., 749 F.3d 1034, 1047-48 (11th Cir. 2014). Under the failure-to-train theory, a supervisor may be held liable "only where the failure to train amounts to deliberate indifference to

the rights of persons with whom the [officers] come into contact."
Id. at 1052 (alteration in original). Under the deliberate
indifference standard, a plaintiff must demonstrate the supervisor
had "actual or constructive notice that a particular omission in
[a] training program causes . . . employees to violate [an
inmate's] constitutional rights, and that armed with that
knowledge the supervisor chose to retain that training program."
Id. (quoting Connick v. Thompson, 563 U.S. 51 (2011)).

The linchpin of a supervisory liability claim is an underlying
constitutional violation. Knight through Kerr v. Miami-Dade Cty.,
856 F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based
liability or supervisory liability when there is no underlying
constitutional violation.") (citing City of Los Angeles v. Heller,
475 U.S. 796, 799 (1986)). See also Hicks, 422 F.3d at 1253
(holding the plaintiff could not maintain a supervisory liability
action against jail administrators on a failure-to-train theory
because the court found no underlying constitutional violation by
the officers); Gish v. Thomas, 516 F.3d 952, 955 (11th Cir. 2008)
("Without an underlying violation of [the plaintiff's]
constitutional rights, [the sheriff] cannot be liable in his
individual or official capacity for a failure to train [the
officer] and [the county] cannot be liable on the ground that its
policy caused a constitutional violation.").

While Plaintiff's allegations were facially sufficient to withstand a motion to dismiss (Doc. 52), Plaintiff's supervisory liability claim against Defendant Landrum fails at this juncture of the proceedings. Upon review of the evidentiary basis for Plaintiff's claims, the Court finds Plaintiff fails to demonstrate a constitutional violation against Defendants Corbin, Humphrey, and Rogers, which entitles each of them to qualified immunity. Because there was no underlying constitutional violation, a supervisory liability claim against Defendant Landrum necessarily fails. See Knight, 856 F.3d at 821; Hicks, 422 F.3d at 1253. Accordingly, under the Court's discretionary authority granted by the PLRA, the Court sua sponte dismisses Defendant Landrum from this action. See § 1915(e)(2)(B).

Therefore, it is now **ORDERED**:

1. Defendants' Objection to Plaintiff's Reliance on Inadmissible Evidence (Doc. 115) is **SUSTAINED** to the extent Jenkins' affidavit and sworn complaint constitute inadmissible hearsay, the facts of which Plaintiff fails to demonstrate can "be presented in a form that would be admissible in evidence." Defendants' Objection (Doc. 115) is **OVERRULED** to the extent they object to the Court's consideration of Jenkins' grievance documents.

2.    Defendants' Motion for Summary Judgment (Doc. 106) is **GRANTED**. Defendants Corbin, Humphrey, Rogers, and Tucker are **DISMISSED with prejudice**.

3.    Defendant Landrum is **DISMISSED without prejudice** under 28 U.S.C. § 1915(e)(2)(B).

4.    The Court directs the **Clerk** to enter judgment accordingly, terminate any pending motions, and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 10th day of July, 2019.

_____
BRIAN J. DAVIS
United States District Judge

Jax-6
c:
Counsel of Record